Addie T. COLEMAN, on behalf of herself and others similarly situated, Plaintiff,

v.

GENERAL MOTORS ACCEPTANCE CORPORATION and Beaman Automotive Group, d/b/a Beaman Pontiac Group, Defendants.

No. 3:98–0211.

United States District Court, M.D. Tennessee, Nashville Division.

Aug. 29, 2000.

Clinton W. Watkins, Brentwood, TN, Michael E. Terry, Nashville, TN, Wyman O. Gilmore, Jr., Grove Hill, AL, Daniel L. Berger, Seth Lesser, Darnley Stewart, Leah Guggenheimer, Bernstein, Litowitz, Berger & Grossmann, LLP, New York City, Gary Klein, Stuart Rossman, Boston, MA, for plaintiff.

Stephen G. Anderson, Brigid M. Carpenter, Baker, Donelson, Bearman & Caldwell, Nashville, TN, Anne Price Fortney, Markus Bruce Heyder, Lovells, Washington, DC, James Robert Bruinsma, Chicago, IL, John Thomas Feeney, III, Feeney & Murray, PLLC, Nashville, TN, for defendants.

Kenneth Edwin Douthat, Tuke, Yopp & Sweeney, Nashville, TN, for Americn Financial Services Association.

Douglas Ray Pierce, King & Ballow, Nashville, TN, for The New York Times Company and ABC, American Broadcasting Company, Inc.

James William Cameron, III, Harwell, Howard, Hyne, Gabbert & Manner, Nashville, TN, for Bill Heard Chevrolet.

## MEMORANDUM

TRAUGER, District Judge.

This case is before the court on Plaintiff's Motion for Class Certification (Docket No. 124), to which Defendant General Motors Acceptance Corporation ("GMAC") has responded (Docket No. 209), and the plaintiff has replied (Docket No. 243). Defendant GMAC has filed a Motion for Summary Judgment (Docket No. 193),[1] to which the plaintiff has responded (Docket No. 245), and GMAC has replied (Docket No. 252). Oral argument was held on August 7, 2000.

## DISCUSSION

### I. Motion for Class Certification

Plaintiff seeks to bring this suit on behalf of herself and all others similarly situated. She defines the proposed class as "[a]ll African American consumers who obtained financing from GMAC in Tennessee pursuant to GMAC's 'Retail Plan—Without Recourse'[2] between May 10, 1989[3] and the date of judgment and who were charged a finance charge markup greater than the average finance charge markup charged white consumers."[4] (Docket No. 216 at ¶ 139)

1. GMAC initially filed this motion for summary judgment on the plaintiff's Second Amended Complaint (Docket No. 45). However, during the pendency of this motion, the plaintiff was permitted to file a Third Amended Complaint (Docket No. 216) and, on August 9, 2000, pursuant to court order (Docket No. 265), filed her Fourth Amended Complaint (Docket No. 266). There are no material differences between these amended complaints as they relate to the motions under consideration.

2. As defined by the plaintiff, the phrase "[w]ithout recourse" refers to the situation whereby GMAC, as the assignee of the automobile financ-

ing transaction, cannot require payment by the automobile dealer, such as Beaman, in the event that the consumer defaults on the financing agreement. *See* Third Amended Complaint at ¶ 32.a.

3. The court assumes that the inception of the Finance Charge Markup Policy occurred at the same time as GMAC's use of the tier-based financing system.

4. According to the plaintiff, GMAC began using a tier-based financing system on May 10, 1989. (Third Amended Complaint at ¶ 32.b.) *See also* Docket No. 246, Plaintiff's Statement of Disputed

The plaintiff alleges that GMAC utilizes a retail credit pricing system in which there are two components to the annual percentage rate ("APR") set in its retail installment sales contracts: the "Buy Rate" and the "Finance Charge Markup". The "Buy Rate" is the portion of the APR that "is the risk-related interest rate required by GMAC for a particular transaction." (Third Amended Complaint at ¶ 32.c.) The "Finance Charge Markup" is "the non-risk charge added to the Buy Rate" by the dealer (Third Amended Complaint at ¶ 32.f.), who must not exceed a limitation set by GMAC's policy. According to the plaintiff, there are incentives in GMAC's retail finance system to "encourage imposition of the subjective non risk related markup." (Third Amended Complaint at ¶ 83.c.)

In order for a class to be certified pursuant to Rule 23 of the Federal Rules of Civil Procedure, the plaintiff must first establish the requirements of Rule 23(a): "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *Rutherford v. City of Cleveland,* 137 F.3d 905, 909 (6th Cir.1998).

If the plaintiff is able to satisfy these requirements, the plaintiff must demonstrate that the class should be certified under at least one of the three categories of class actions described in Rule 23(b). Rule 23(b) provides that a class action may be maintained if, in addition to the requirements of Rule 23(a),

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would

as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. . . .

FED.R.CIV.P. 23(b).

■ Before certifying a class, district courts must undertake a "rigorous analysis" into whether the requirements of Rule 23 have been met. *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). While the court has broad discretion in evaluating whether to certify a class, this discretion "must be exercised within the framework of Rule 23." *See In re American Med. Systems, Inc.,* 75 F.3d 1069, 1071 (6th Cir.1996). The party seeking class certification bears the burden of proof. *Id.* The court takes the allegations of the plaintiff as true and any doubts as to certifying the class should be resolved in the plaintiff's favor. *See Cross v. National Trust Life Ins. Co.,* 553 F.2d 1026, 1029 (6th Cir.1977).

The plaintiff has met her burden with respect to the requirements of numerosity, commonality and adequacy of representation. With respect to the numerosity requirement, the plaintiff approximates that the class exceeds 10,000 members. *See Bittinger v. Tecumseh Products Co.,* 123 F.3d 877, 884 n. 1 (6th Cir.1997) (finding that class of over 1,100 individuals satisfied the numerosity requirement as joinder of these parties would be impracticable). As for the commonality requirement, the plaintiff states that there are no "significant individual issues" and has

Facts, at ¶ 7 ("In 1989, GMAC began using its MAPS system to assign GMAC applicants to

credit risk tiers and assigning rates based on risk tier assignment.").

identified five common factual and legal issues relating to GMAC's Finance Charge Markup Policy. *See* Docket No. 216 at 140.b.[5] *See also Bittinger,* 123 F.3d at 884 ("Rule 23(a) simply requires a common question of law or fact.") Finally, with respect to the adequacy of representation element, the plaintiff states that she "has no interest that conflicts with or is antagonistic to the interests of the proposed class." (Third Amended Complaint at ¶ 140.b.) In support of her motion, the plaintiff submitted an affidavit in which she states, "I am willing to serve as class representative and I believe that I understand my obligations." (Docket No. 130, Ex. 1 at ¶ 5) She also submitted affidavits from her attorneys, all of whom appear to be competent and experienced. *See* Docket Nos. 131–133, 267.

GMAC's challenge to class certification is focused on the plaintiff's failure to meet the requirement of typicality. Under the typicality prong, the plaintiff must establish that her claim is typical of the claims of the other members of the class.[6] "A claim is typical if it arises from the same event or course of conduct giving rise to the claims of other class members and is based on the same legal theory." *See Senter v. General Motors Corp.,* 532 F.2d 511 (6th Cir.1976). *See also*

*In re American Med. Systems,* 75 F.3d at 1082 ("Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.") GMAC argues that the plaintiff's allegations as to typicality are inadequate in that she merely asserts that "her claim and the claim of class members 'all arise from the same practice or course of conduct,' which is said to be the 'GMAC Finance Charge Markup Policy[.]'" (Docket No. 209 at 15) Specifically, GMAC argues that Coleman is not a member of the proposed class of African–American car buyers who obtained GMAC financing and "who were charged a finance charge markup greater than the average finance charge markup charged white consumers."[7] (Third Amended Complaint at ¶ 139)

In support of her allegation that this class of persons was charged a finance charge markup greater than the average finance charge markup charged to white consumers, the plaintiff relies on a comparison analysis of GMAC's finance charge markup charged to African Americans and whites. *See* Docket No. 128 (Report of Dr. Debby A. Lindsey). Using a sample of 4,932 automobile purchasers who received financing from GMAC,[8] the

---

**5.** The plaintiff has identified the following common factual and legal issues in her Third Amended Complaint:

   i. Whether GMAC's Finance Charge Markup Policy is a specific facially neutral credit pricing practice that has effected racial discrimination in violation of the Equal Credit Opportunity Act?

   ii. Whether there are disparities between the average amount of Finance Charge Markup imposed on African Americans and the average Finance Charge Markup imposed on white persons of equal credit worthiness?

   iii. If there is a disparity in the Finance Charge Markup averages, is it statistically significant enough to indicate a causal connection between the Finance Charge Markup Policy and the discriminatory effect?

   iv. If there is a disparity in the Finance Charge Markup averages, is it demonstrated by statistical evidence from an adequate, competent and relevant data set?

   v. If there is a disparity, is there a legitimate business reason to justify GMAC's Finance Charge Markup Policy that could not be achieved by a practice that has a less disparate impact?

(Third Amended Complaint at ¶ 140.b.)

**6.** The Supreme Court has indicated that there are similarities between the commonality and typicality prongs of the Rule 23(a) analysis. In *General Tel. Co. of the Southwest,* 457 U.S. at 157 n. 13, 102 S.Ct. 2364, the Court stated that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances *maintenance of a class action is economical* and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."

**7.** Plaintiff's GMAC automobile financing contract rate was 20.75%, which included a 2.5% finance charge markup.

**8.** Of the 4,932 persons whose records were evaluated, 4,157 were listed as white and 775 were listed as African–American. The racial identity was taken from driver's license records of the Tennessee Department of Transportation. *See* Docket No. 128 at 5, 8. *See also* Docket No. 209 at 16.

plaintiff's expert determined that, on average, African Americans were charged a finance charge markup of $959.18, while whites were charged $643.83—a difference of $315.35. *See* Docket No. 128 at 21.

GMAC disputes Dr. Lindsey's findings, arguing that the plaintiff's statistical analysis is flawed. GMAC contends that the plaintiff's pool is too inclusive and that, if the statistical sample is more narrowly defined such that it only includes purchasers who were given a "D Tier" rating[9] and who purchased their vehicle in the same month as the plaintiff, then it would turn out that the plaintiff's APR was lower than the APR "negotiated by" two-thirds of the white customers.[10] *See* Docket No. 209 at 17. If the pool is more narrowly defined and broken up into separate subclasses, then GMAC contends that the plaintiff would no longer be an appropriate class representative.[11] Plaintiff responds that GMAC's statistical analysis performed by Dr. William Wecker is flawed, pointing to Dr. Wecker's comparison of consumers' APR rather than what the plaintiff has alleged as racially discriminatory—the finance charge markup component of the APR. To rebut Dr. Wecker's findings, the plaintiff has submitted the report of Dr. Mark A. Cohen. *See* Docket No. 248.

Although the court must "probe behind the pleadings" in order to determine whether class certification is appropriate, *Falcon,* 457 U.S. at 160, 102 S.Ct. 2364, the court must not "confus[e] evidence ... on the merits with the altogether different question of whether there are facts alleged which would justify the case going to trial as a class

action." *Senter,* 532 F.2d at 523. Thus, the court "will focus primarily on the allegations set forth in [the plaintiff's] pleadings, but will also, when necessary, consult the present evidentiary record to better ascertain the precise nature of [the plaintiff's] allegations and claims." *Fuller v. Fruehauf Trailer Corp.,* 168 F.R.D. 588, 595 n. 11 (E.D.Mich. 1996). *See also Weathers v. Peters Realty Corp.,* 499 F.2d 1197, 1200 (6th Cir.1974) ("Maintainability may be determined by the court on the basis of the pleadings, if sufficient facts are set forth, but ordinarily the determination should be predicated on more information than the pleadings will provide."). The court's responsibility when deciding whether certification of a class is appropriate is to "not assess the likelihood of success on the merits." *Id.* at 1201.

■ GMAC argues that certification of the plaintiff's proposed class is not appropriate because the plaintiff's financing transaction did not occur as the plaintiff claims it did and, moreover, no transactions occur in this manner. *See* Docket No. 209 at 18. Thus, it appears that there is a genuine factual dispute as to how the plaintiff's financing transaction was handled and how financing transactions in general take place. As discussed above, the court need not resolve factual disputes or evaluate the record as if it were deciding a motion for summary judgment in order to decide the plaintiff's motion for class certification. Typicality does not require that every GMAC financing transaction occur in the same exact manner; instead, the plaintiff's claim must arise from

---

**9.** As alleged by the plaintiff, GMAC uses a tier-based system for the assessment of a consumer's creditworthiness. "GMAC categorizes its customers by risk and establishes an appropriate risk-related finance charge rate after considering numerous individual and deal attributes." (Third Amended Complaint at ¶ 29.b.)

**10.** By reducing the comparison pool to only the 22 white customers who were assigned to the "D Tier" and who purchased automobiles during the same month as the plaintiff, Dr. Wecker, GMAC's expert, found that the plaintiff's APR was lower than that negotiated by two-thirds of the white consumers. *See* Docket No. 204, Ex. 15, Ex. C. In his report, Dr. Cohen, the plaintiff's rebuttal expert, notes that, of the 22 white consumers compared, six of the 22 financed less than the

plaintiff and had higher buy rates than the plaintiff, regardless of whether there was a finance charge markup. *See* Docket No. 248 at 5–6.

**11.** GMAC further argues that, in analyzing GMAC automobile financing records, the plaintiff failed to take into account certain differences in the individual records that would impact any attempt to analyze whether there is a disparity in financing based on race. GMAC argues that the plaintiff failed to, and should have, taken into account the following factors: (1) whether the car was new or used; (2) the date of the transaction; (3) the availability of special incentive deals; (4) various creditworthiness factors; and (5) variations in buyer preference. (Docket No. 209 at 18)

the same "practice or course of conduct," here, the use of GMAC's policy to make racially discriminatory finance charge mark-ups. *See* 1 NEWBERG ON CLASS ACTIONS, § 3–13, at 3–76. *Cf. Sprague v. General Motors Corp.,* 133 F.3d 388, 399 (6th Cir.1998) (finding no typicality because each plaintiff's claim depended on the representations and communications made by GM to that particular individual and the fact patterns varied enormously). The court finds that the plaintiff, at this stage of the proceedings, has sufficiently alleged facts which would justify certifying the proposed class under Rule 23(a).

Once the plaintiff has satisfied the requirements of Rule 23(a), the plaintiff must still demonstrate that the class should be certified under Rule 23(b). *See In re American Med. Systems,* 75 F.3d at 1079. In her complaint, the plaintiff alleges that class certification would be appropriate under Rule 23(b)(1), (2) or (3). (Third Amended Complaint at ¶¶ 141–143) In her reply memorandum, however, she argues only that the proposed class should be certified as defined in Rule 23(b)(2) and (3). (Docket No. 243 at 10) Thus, the court limits its analysis to these sections.

Under Rule 23(b)(2), a class action may be maintained where "the party opposing the class has acted ... on grounds generally applicable to the class, thereby making appropriate final injunctive relief ... with respect to the class as a whole." Here, the plaintiff seeks both injunctive relief[12] and "any damages allowed by law." (Third Amended Complaint at ¶ 41) GMAC argues that certification under Rule 23(b)(2) is not appropriate because the plaintiff seeks monetary damages[13] in addition to injunctive relief.[14] The defendant also argues that the members of the plaintiff's proposed class do not need injunctive relief because they have already been assessed the finance charge markup and monetary damages will remedy any alleged discriminatory effect of GMAC's policy.

In *Senter,* the Sixth Circuit held that certification of the proposed class was appropriate under Rule 23(b)(2) where the plaintiffs' primary prayer was for injunctive relief, finding that the additional request for back pay did not preclude certification under Rule 23(b)(2). *See Senter,* 532 F.2d at 525. More recently, the Sixth Circuit, in an unpublished opinion, stated that "[a]lthough the issue has not yet been squarely presented to the Supreme Court, the Court has expressed serious reservations about the propriety of certifying a 23(b)(2) class when compensatory or punitive damages are in issue, due to the lack of notice to class members or the opportunity for those members to 'opt out' of the class action." *Butler v. Sterling, Inc.,* 210 F.3d 371, 2000 WL 353502, at *6 (6th Cir. Mar. 31, 2000) (unpublished) (citing *Ticor Title Ins. Co. v. Brown,* 511 U.S. 117, 120–21, 114 S.Ct. 1359, 128 L.Ed.2d 33 (1994)). However, the Sixth Circuit continued,

> [e]ven accepting the proposition that, in some cases, compensatory and/or punitive damages may be recoverable by a 23(b)(2) class-an issue undecided in this circuit-all other circuits that have considered the issue have held that certification of a 23(b)(2) class turns on whether the injunc-

---

**12.** The plaintiff requests that such injunctive relief include:

a. Prohibition of non-risk related Finance Charge Markup, or alternatively, restrictions limiting the amount of Finance Charge Markup to such a range as to prevent statistically significant disparate effect;
b. Requiring ECOA training of GMAC employees;
c. Requiring GMAC to provide ECOA training for its dealer arrangers/originators;
d. Requiring GMAC to impose standards regarding the minimum qualifications of persons engaged in arranging/originating GMAC finance transactions;
e. Requiring GMAC to impose standards requiring its dealer arranger[s]/originators to monitor the racial pattern of the Finance Charge Markup Policy;
f. Requiring GMAC to monitor and/or audit the racial pattern of the Finance Charge Markup Policy.
(Third Amended Complaint at ¶ 145)

**13.** The plaintiff's request for damages seems to be limited to the amount she allegedly overpaid as part of her Finance Charge Markup as a result of its discriminatory implementation.

**14.** GMAC also argues that certification under Rule 23(b)(2) is not appropriate because injunctive relief is not feasible because "no single injunction could be appropriate for the entire class." (Docket No. 209 at 25)

tive and/or declaratory relief sought on behalf of the class 'predominate[s]' relative to any incidental monetary damages requested.

*Id.* (citing *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 410 (5th Cir.1998)). *See also Mitchell v. Dutton,* 865 F.2d 1268, 1989 WL 933, at *4 (6th Cir. Jan. 3, 1989) (unpublished) ("Although the primary relief sought by a Rule 23(b)(2) class is equitable, plaintiffs' requests for monetary damages did not preclude their certification as members of the class.")

■ Plaintiff argues that her request for injunctive relief is "central to this litigation" because she is "attempting to end a decade of discrimination against African–Americans by eliminating GMAC's finance mark-up policy...." (Docket No. 243 at 5) While the plaintiff has requested damages, it appears that the award of such damages is incidental to the primary relief requested—the end of the discriminatory implementation of the Finance Charge Markup.[15] The plaintiff's injuries and those of the class will not be remedied by mere monetary damages. In addition, certification under Rule 23(b)(2) has generally been found to be appropriate for civil rights actions. *See Senter,* 532 F.2d at 525 (finding certification under Rule 23(b)(2) appropriate, noting that "lawsuits alleging class-wide discrimination are particularly well suited for 23(b)(2) treatment").

Under Rule 23(b)(3), a class action may be maintained if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and [if] a class action is superior to all other available methods for the fair and effective adjudication of the controversy." FED.R.CIV.P. 23(b)(3). GMAC argues that certification under Rule 23(b)(3) would not be appropriate because common issues do not predominate and a class action would not be an efficient means of adjudication.

For a disparate impact case, the plaintiff must establish (1) a specifically identifiable policy or practice, (2) a statistically significant difference in outcomes between African Americans and whites, and (3) a causal connection between the policy or practice and the disparate outcomes. *See Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 655–58, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). GMAC concedes that the specific policy of GMAC—the Finance Charge Markup Policy—is common to all members of the proposed class. (Docket No. 209 at 26–27) GMAC, however, argues that the other elements of the plaintiff's prima facie case raise individual questions. GMAC has identified numerous factors that may explain the disparity in the amount of the finance charge markup charged to African Americans and to whites, including negotiation skills, buyer preferences, and self-assessment of credit-worthiness. *See* Docket No. 209 at 28. GMAC contends that the existence of these factors in individual cases means that common issues do not predominate. As a corollary, GMAC states that, in light of these individual factors that may have played a role in individual cases, a class action is not the most efficient means of adjudication.

■ In response, the plaintiff attempts to discount these individual factors that may have impacted the amount of an individual's finance charge markup. At this stage of the proceedings, the plaintiff has not established that these individual factors played no role in whether a finance charge markup was charged and the amount of any such markup. Furthermore, the plaintiff acknowledges that there are individual issues with respect to damages. *See* Docket No. 274, August 7, 2000 Tr. at 103. While the plaintiff has alleged that each member of the proposed class was discriminated against to one degree or another through the use of GMAC's Finance Charge Markup Policy, the court finds that certification is not clearly appropriate under this ground. *See In re American Med. Systems,* 75 F.3d at 1085 (finding that Rule 23(b)(3) certification inappropriate where the plaintiffs had all used different models of the defendant's allegedly defective product and there were clear individual issues).

---

**15.** *See* Docket No. 274, August 7, 2000 Transcript at 98 ("This case is built on equitable relief. Equitable relief is the primary relief in this case.").

Thus, the court certifies the class under Rule 23(b)(2) and declines to certify the class under Rule 23(b)(3).

## II. *Defendant's Motion for Summary Judgment*

Defendant GMAC has moved for summary judgment on the plaintiff's Equal Credit Opportunity Act ("ECOA")[16] claim.

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).

In order to prevail, the movant has the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). In determining whether the movant has met its burden, the court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If the nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537–38 (6th Cir.1999) (citing *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon*, 107 F.3d 1171, 1174–75 (6th Cir. 1997). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in his or her favor. *See id.* at 261, 106 S.Ct. 2505.

The court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Street*, 886 F.2d at 1479. If the evidence offered by the nonmovant is "merely colorable," "not significantly probative," or is not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249–52, 106 S.Ct. 2505.

### B. *Discussion*

Plaintiff seeks to establish her ECOA claim under a disparate impact theory. In a disparate impact case, the plaintiff must first make out a prima facie case by (1) identifying a specific policy or practice used by the defendant and (2) showing, through statistical evidence, that the policy or practice has caused an adverse effect on the protected group.[17] *See, e.g., Abbott v. Federal Forge, Inc.*, 912 F.2d 867, 872 (6th Cir.1990). GMAC argues that it is entitled to summary

---

**16.** The ECOA provides that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—(1) on the basis of race, color, religion, national origin, sex or marital status, or age ...." 15 U.S.C. § 1691(a) (1994).

**17.** If the plaintiff does make out a prima facie case, then the defendant must articulate a legitimate, non-discriminatory reason for the policy or practice. Then the plaintiff has the burden to

demonstrate that the reason is either a pretext for discrimination or that there is an alternate practice or policy that would also serve the defendant's interests and would not create the same disparate impact. The court notes that, in an ECOA case, the burden of proof allocation follows that set forth in the Civil Rights Act of 1991. *See* 12 C.F.R. Part 202, Supp. I at § 202(6)(a)(2) (2000).

judgment because the plaintiff cannot establish a prima facie case of discrimination.

GMAC first argues that the plaintiff cannot demonstrate that she was treated less favorably than similarly-situated white consumers. In support of this argument, GMAC challenges the findings of the plaintiff's expert, Dr. Deborah A. Lindsey, who looked at a sample of 4,932 automobile purchasers who had received financing from GMAC and determined that, on average, African Americans were charged a finance charge markup $315.35 higher than white consumers. *See* Docket No. 128 at 21. GMAC points to the findings of its own expert, Dr. William Wecker, who compared the plaintiff's financing transaction to the 22 white consumers who also received GMAC financing, were also in the "D Tier" and who purchased their cars in the same month as the plaintiff. By so narrowing the sample, Dr. Wecker found "the APR that Coleman paid on her retail installment sales contract was lower than the average APR for whites in the 'D' Tier who purchased cars within the same time frame as Coleman. Moreover, the average 'markup' for whites in the 'D' Tier at the time of Coleman's transaction was *higher* than for Coleman."[18] (Docket No. 194 at 8 (emphasis in original)) *See also* Docket No. 204, Ex. 15 (Wecker Affidavit) at (¶¶ 8–9).

■ At this stage in the proceedings, the court is not persuaded by GMAC's attempts to prove that its Finance Charge Markup Policy does not have a disparate impact on African–American consumers. The plaintiff has provided, for purposes of establishing a prima facie case, "statistical evidence of a kind and degree sufficient to show that the practice in question has caused" the assessment of the higher finance charge markup "because of their membership in a protected group." *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). There is a clear dispute between the parties as to the significance of the statistical findings of the experts. Such an issue is properly left for the finder of fact.

■ GMAC next argues that it cannot be found liable under the ECOA because it was Beaman's assignee, and the ECOA "expressly shields assignees like GMAC from liability in cases like this unless the assignee knew or had reason to know of the direct creditor's violation."[19] (Docket No. 194 at 9) GMAC seeks to avoid liability by claiming that it cannot be held liable for any alleged ECOA violations committed by Beaman. The plaintiff does claim that GMAC is vicariously liable for Beaman's violations because it had the requisite knowledge. *See* Docket No. 274, August 7, 2000 Tr. at 55, 59, 63. GMAC does not clearly set out the undisputed facts that would establish that it did not have the knowledge requisite for vicarious liability.

Moreover, the plaintiff also seeks to hold GMAC liable directly for its own ECOA violations as a creditor. For purposes of the ECOA, a "creditor" is "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C.A. § 1691a(e) (West 1998). GMAC clearly conceded during oral argument that it is a creditor for pur-

---

18. To rebut these findings, the plaintiff submitted the report of Dr. Mark A. Cohen who analyzed the findings of both Dr. Lindsey and Dr. Wecker. (Docket No. 248) He compared his results with those of Dr. Lindsey and found that "using the estimated [Finance Charge Markup] instead of the 'total dealer participation' figures available to Dr. Lindsey increases the estimated dollar value of racial disparity. For example, while the average total dealer participation was estimated to be $315.35 higher for black[s] than whites, the average [Finance Charge Markup] is estimated to be $425.66 higher for blacks." (Docket No. 248 at 9) He also found that "Dr. Lindsey's original finding is a robust result that is insensitive to

model specification. In other words, the finding that black borrowers pay a higher [Finance Charge Markup] than whites is insensitive to changes in the statistical model that is used. In addition, I find little merit in Dr. Wecker's criticisms of her approach." (Docket No. 248 at 1–2)

19. Under the ECOA, a "person is not a creditor regarding any violation of the act or this regulation committed by another creditor unless the person knew or had reasonable notice of the act, policy, or practice that constituted the violation before becoming involved in the credit transaction." 12 C.F.R. § 202.2(*l*) (2000).

poses of the ECOA,[20] and GMAC does not maintain that the undisputed facts warrant summary judgment in its favor on this ground.

■ GMAC is not entitled to summary judgment on direct or vicarious liability as a creditor under ECOA,[21] and the motion will be denied on this ground.

■ GMAC also contends that summary judgment is appropriate because the plaintiff has not identified a "specific policy that caused a disparate impact on a protected group." (Docket No. 194 at 11) And, even if she did identify such a policy, the identified policy "cannot be the cause of the claimed statistical disparity." (Docket No. 194 at 13) As discussed above, in order to establish a prima facie case, the plaintiff must identify a specific policy or practice used by the defendant and show, through statistical evidence, that the policy or practice has caused an adverse effect on the protected group. *See, e.g., Abbott v. Federal Forge, Inc.*, 912 F.2d 867, 872 (6th Cir.1990). The court finds that the plaintiff has identified a policy sufficient to prove her ECOA claim under a disparate impact theory. The plaintiff asserts that

> GMAC maintained a consistent and unbroken practice of setting the minimum rate at which GMAC would lend, based on the credit profile of the borrower, and communicating this rate to the dealer. Integral to this business practice was the authorizing of the dealers to add markup to the

minimum rate in order to generate profit for the dealer and GMAC.

(Docket No. 245 at 9) *See also* Docket No. 264 (Plaintiff's Statement of Disputed Facts) at ¶¶ 8, 10, 11, 13, 15–16.[22] At this stage, the court rejects GMAC's contention that the plaintiff's iteration of its Finance Charge Markup Policy "falls far short of the specific policy required by the case law as part of any disparate impact analysis." (Docket No. 194 at 13) Insofar as GMAC argues that its Finance Charge Markup Policy is not the cause of the alleged statistical disparity, the court finds that the plethora of disputed facts preclude summary judgment on this ground.

GMAC next argues that the plaintiff cannot establish a disparate impact claim under the ECOA because her claim "involves a policy that she alleges is subjective and/or discretionary." (Docket No. 194 at 14) GMAC contends that there is no relevant case law to support the plaintiff's position that disparate impact analysis can be used to challenge discretionary (rather than uniformly applied) practices.

First, there is abundant support indicating that a disparate impact theory can be used in ECOA cases. In the relevant federal regulations, it is stated that "[t]he legislative history of the [Equal Credit Opportunity] Act indicates that the Congress intended an 'effects test' concept, as outlined in the employment field by the Supreme Court in the cases of *Griggs v. Duke Power Co.*, 401 U.S. 424, 91

---

**20.** It may have had no choice, given the deposition testimony of Joyce Wiedman, GMAC's sales purchase branch manager, that GMAC is a creditor under the ECOA. (Docket No. 123, Ex. 1, Wiedman Dep. at 30)

**21.** Furthermore, GMAC cannot avoid liability under the ECOA by delegating aspects of the financing transaction to its dealers. By way of analogy to cases under the Fair Housing Act, the plaintiff argues that there is a non-delegable duty to not discriminate under the ECOA. *See* Docket No. 274, August 7, 2000 Tr. at 76. *See also Green v. Century 21*, 740 F.2d 460, 465 (6th Cir.1984) ("Under federal housing law a principal cannot free himself of liability by delegating a duty not to discriminate to an agent."); *Marr v. Rife*, 503 F.2d 735, 741 (6th Cir.1974) (finding that, under the Fair Housing Act, "the duty to obey the law is non-delegable"). Fair Housing Act cases have been used as persuasive authority in ECOA cases. *See Emigrant Sav. Bank v. Elan*

*Management Corp.*, 668 F.2d 671, 673 (2d Cir. 1982) (finding that the defendant's ECOA claim did not require separate consideration from his Fair Housing Act claim); *United States v. Beneficial Corp.*, 492 F.Supp. 682, 686 (D.N.J.1980), aff'd, 673 F.2d 1302 (3d Cir.1981); *Shuman v. Standard Oil Co.*, 453 F.Supp. 1150, 1153–54 (N.D.Cal.1978).

**22.** GMAC has not filed a response to the plaintiff's Statement of Disputed Facts (Docket No. 246). Pursuant to Local Rule 8(b)(7) for the United States District Court for the Middle District of Tennessee, "the non-movant's response may contain a concise statement of additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried.... If the non-moving party has asserted additional facts, the moving party shall be allowed to respond to these additional facts...."

S.Ct. 849, 28 L.Ed.2d 158 (1971), and *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), to be applicable to a creditor's determination of creditworthiness." 12 C.F.R. § 202.6(a) n. 2 (2000). Despite this reference to creditworthiness, the court does not believe that a distinction was being made such that the effects test is not appropriate with respect to the terms of the credit given to a consumer and all aspects of a credit transaction.[23] *See* Gwen A. Ashton, "The Equal Credit Opportunity Act from a Civil Rights Perspective: The Disparate Impact Standard," 17 ANN. REV. BANKING L. 465 (1998); *Haynes v. Bank of Wedowee*, 634 F.2d 266 (5th Cir. 1981) (noting use of disparate impact standard in ECOA case); *Latimore v. Citibank, F.S.B.*, 979 F.Supp. 662 (N.D.Ill.1997) (same); *A.B. & S. Auto Serv., Inc. v. South Shore Bank of Chicago*, 962 F.Supp. 1056 (N.D.Ill. 1997) (same); *Gross v. United States Small Bus. Admin.*, 669 F.Supp. 50 (N.D.N.Y.1987) (same); *Sayers v. General Motors Acceptance Corp.*, 522 F.Supp. 835 (W.D.Mo.1981) (same); *Cherry v. Amoco Oil Co.*, 490 F.Supp. 1026 (N.D.Ga.1980) (same). Thus, there is clear support for the use of a disparate impact theory in an ECOA case.

Although GMAC contends that, under the ECOA, there is no support for using a disparate impact analysis to challenge discretionary practices, there is no discernible reason why a disparate impact analysis should not be used in these circumstances.[24] In *Watson*, the Court held that

disparate impact analysis is in principle no less applicable to subjective employment criteria then to objective or standardized tests. In either case, a facially neutral practice, adopted without discriminatory intent, may have effects indistinguishable from intentionally discriminatory practices.... If an employer's undisciplined system of subjective decisionmaking has precisely the same effects as a system pervaded by impermissible and intentional discrimination, it is difficult to see why Title VII's prescription against discriminatory actions should not apply.... We conclude, accordingly, that subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases.

*Watson*, 487 U.S. at 990–91, 108 S.Ct. 2777. *See also Buycks–Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 322, 331 (N.D.Ill.1995) (in discussing commonality requirement in deciding motion for class certification in ECOA case, stating that "[t]he subjective application of neutral underwriting criteria is standardized conduct because the loan originators have the opportunity to use their discretion with respect to each loan applicant. Moreover, this standardized conduct can be readily identified for purposes of assessing evidence of disparate impact.")

The court finds that use of a disparate impact theory in this case is appropriate where the GMAC policy "is race neutral (or objective) by its terms," but "[w]hen exercised by those granted discretion under the neutral policy, its effect is to discriminate."

---

**23.** Indeed, in the Official Staff Interpretations of this section, the regulations state that

[t]he effects test is a judicial doctrine that was developed in a series of employment cases decided by the Supreme Court under Title VII .... Congressional intent that the doctrine apply to the *credit area* is documented in the Senate Report that accompanied H.R. 6516, No. 94–589, pp. 4–5, and in the House Report that accompanied H.R. 6516, No. 94–210, p. 5. The act and regulation may prohibit a *creditor practice* that is discriminatory in effect because it has a disproportionately negative impact on a prohibited basis, even though the creditor has no intent to discriminate and the practice appears neutral on its face, unless the creditor practice meets a legitimate business need that cannot reasonably be achieved as well by means that are less disparate in their impact.

12 C.F.R. Part 202, Supp. I at § 202(6)(a)(2) (2000) (emphasis added).

**24.** GMAC argues that because of the "substantive differences" between employment laws and the ECOA, disparate impact analysis is not appropriate in ECOA cases where the challenge is to subjective and discretionary practices. (Docket No. 194 at 15) In support, GMAC points to the fact that in the federal regulations, the example given to illustrate the use of a disparate impact analysis is a "prototypical disparate impact target, a *neutral policy* that is *uniformly applied* to all credit applicants." (Docket No. 194 at 15 (emphasis in original), citing 12 C.F.R. Part 202, Supp. I, § 202.6(a)(2)) Again, the fact that the regulations use such an example does not preclude the use of the effects test to challenge discretionary practices.

(Docket No. 245 at 15) Accordingly, GMAC's motion for summary judgment will be denied on this ground.

GMAC also argues that the plaintiff's ECOA claim must fail because it is based on conduct that occurred on April 1, 1995, "before the ECOA became applicable as between GMAC and Coleman." (Docket No. 194 at 16) According to GMAC, because the APR was decided on April 1, 1995, before her credit application was received by GMAC on April 3, the discrimination happened on April 1, at a time when only Beaman was involved in the transaction. The court finds this argument completely without merit. First, the April 1 credit application was on a GMAC form. (Docket No. 184, Ex. 25) Second, there was apparently an April 1 contract signed by Coleman that GMAC agrees was on a GMAC form as it was "exactly or very similar to" the contract agreed to on April 11, 1995. (Docket No. 274, August 7, 2000 Tr. at 12) Finally, Beaman's targeting of the APR was done using the provisions, and within the parameters, of GMAC's challenged policy. (Docket No. 246) (Plaintiff's Statement of Disputed Facts at ¶¶ 55–59, 64 )

■■ GMAC next argues that the plaintiff cannot hold GMAC vicariously liable for the ECOA violations of Beaman, either by virtue of GMAC's status as an assignee of the plaintiff's contract under the Federal Trade Commission's ("FTC") Holder in Due Course Rule or under common law agency principles. The FTC rule provides that every consumer credit contract must contain the following language: "[a]ny holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder." 16 C.F.R. § 433.2(a) (2000). The plaintiff argues that, under the FTC Rule, "[o]ther than the condition that the consumer may recover no more than amounts paid, as defined by the FTC, there

are no other limitations on the creditor/assignee's liability under the required contractual language."[25] (Docket No. 245 at 18) Despite the plaintiff's claim that there are no limitations on claims against assignees, GMAC argues that the plaintiff seeks to hold it liable through the use of the FTC Rule even though the federal regulations implementing the ECOA "limit an assignee's liability for the ECOA violations of the assignor to situations where the assignee knew or reasonably should have known of the act, policy or practice of the assignor that constituted the violation. . . ." (Docket No. 252 at 7–8) The plaintiff has not responded to this argument. The court finds that, on the basis of the argument made by GMAC, the plaintiff cannot seek to establish GMAC's ECOA liability based on Beaman's actions through the use of the FTC rule. However, this does not prevent the plaintiff from seeking to establish GMAC's liability under the ECOA insofar as it establishes that GMAC, as the assignee, "knew or had reasonable notice of the act, policy, or practice that constituted the violation before becoming involved in the credit transaction." 12 C.F.R. § 202.2(*l* ) (2000).

The plaintiff also seeks to hold GMAC liable for the actions of Beaman under agency principles, contending that "GMAC has vested its dealers with expressed, implicit, and apparent authority." (Docket No. 245 at 20) Under Tennessee law, "the principal test of agency is whether the principal has the right to control the conduct of the agent with respect to matters entrusted to the agent. It is said this right of control is the primary or the essential test of an agency relationship without which no agency exists." *Gehl Corp. v. Johnson,* 991 S.W.2d 246, 248 (Tenn.Ct. App.1998) (citations omitted). Agency is defined as a "relation created by express or implied contract or by law, whereby one party delegates the transaction of some lawful business with more or less discretionary power to another, who undertakes to manage the

---

**25.** The plaintiff points to an opinion letter from the FTC in support of its argument that "it views the provision as clear, placing no limitations on the availability of consumer claims against assignees." (Docket No. 245 at 19 and Ex. 1)

However, the letter does not make any reference to the ECOA or the FTC Rules construction with other statutes. The court has not found any cases discussing the use of the FTC Rule in ECOA cases.

affair and render to [the principal] an account thereof." BLACK'S LAW DICTIONARY 62 (6th ed.1990) (quoted in *Garner v. Blount County*, 2000 WL 116026, at *2 (Tenn.Ct.App. Jan. 28, 2000)). The existence of a principal-agent relationship and the scope of the agent's authority are questions of fact. *See Board of Directors of the City of Harriman Sch. Dist. v. Southwestern Petroleum Corp.*, 757 S.W.2d 669, 673 (Tenn.Ct. App.1988).

GMAC argues that the plaintiff's theory is without merit because Beaman was not GMAC's agent. In support, GMAC points to a long line of cases that have, at the summary judgment stage, found no principal-agency relationship between the financing company (such as GMAC) and the dealer (such as Beaman). *See, e.g., Pescia v. Auburn Ford–Lincoln Mercury Inc.*, 68 F.Supp.2d 1269 (M.D.Ala.1999); *Mardis v. Ford Motor Credit Co.*, 642 So.2d 701 (Ala. 1994); *See also Luck v. Primus Automotive Fin. Services, Inc.*, 763 So.2d 243 (Ala.2000) (unpublished); *Holland v. Fidelity Fin. Services, Inc.*, 709 So.2d 1246 (Ala.Civ.App. 1998). In *Pescia*, the court first looked at the wrong alleged by the plaintiff—in that case, the practice of "spot financing" and "spot delivery" and the disclosures required for these types of transactions. The court found that there was no principal-agent relationship between the financing company and the dealer with respect to these issues because the financing company did not "assert or attempt to assert control over that aspect of the business. Nor does [the financing company] control or attempt to control the offer and acceptance process between the dealer and the consumer." *Pescia*, 68

F.Supp.2d at 1283. The evidence did establish that the dealer used forms provided by the financing company, received instructions from the financing company as to the forms, had access to the financing company's computer, and received instructions from the financing company that the plaintiff was to receive a "hard close."[26] *Id.* at 1282.

■ Here, although GMAC contends that Beaman was not acting as GMAC's agent when negotiating financing with the plaintiff,[27] the plaintiff has set forth numerous statements of fact that go to the issue of GMAC's control over Beaman and involvement with respect to the finance charge markup policy.[28] *See* Docket No. 246 at ¶¶ 26–29 (GMAC provides GMAC-specific forms to its dealers), ¶¶ 36–38 (GMAC's offering of finance training to its dealers which includes practicing "GMAC 'sales' techniques"), ¶ 39 (GMAC's offering of a Finance and Insurance Management System, part of which provides a GMAC employee on-site to observe and review the dealer's profitability in financing transactions), and ¶ 41–42 (GMAC's provision of temporary employees to assist dealers with financing transactions). GMAC has not disputed these statements of fact. Thus, the court finds that, at this stage of the proceedings, the plaintiff has presented sufficient evidence to preclude summary judgment and that this determination is a question of fact more properly resolved by the trier of fact.

## CONCLUSION

In conclusion, the court finds that the plaintiff has satisfied the requirements under Rule 23(a). Furthermore, the class can be

---

**26.** A "hard close" is an instruction to the dealer that it inform the customer in detail about the contractual requirements. *See Pescia*, 68 F.Supp.2d at 1283.

**27.** In support, GMAC points to the affidavit of Ms. Georg–Ann Zieger, who was GMAC's Business Development Manager in the Nashville, Tennessee office at the time of the plaintiff's transaction. *See* Docket No. 195, Ex. 7 at ¶¶ 8, 10, 18.

**28.** There is evidence in the record that suggests that GMAC does control the financing transaction process. As explained in a confidential

GMAC memorandum about the Quality Finance Plan,

> We also wish to take this opportunity to clarify an issue which has not been handled consistently in all branches operating under the Quality Finance Plan. Under the plan, discount rates are determined by call-in odds, however, *if the contract received is substantially different* from the call-in (due to a material change in down payment, add ons, terms, etc.) *the contract should be treated as a new transaction and re-scored* for the purpose of a rate determination.

(Docket No. 127, Ex. 16 at 000216–000217 (emphasis added))

certified under Rule 23(b)(2). Plaintiff's motion for class certification is granted. GMAC's motion for summary judgment is denied except to the extent that the plaintiff seeks to establish ECOA liability through the use of the FTC Rule.

An appropriate Order will enter.