*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0179p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

HAZEL GOLDEN,

        *Plaintiff-Appellant,*

    *v.*

CITY OF COLUMBUS; CHERYL ROBERTO, Director of
Public Utilities for the City Of Columbus,
        *Defendants-Appellees.*

No. 03-4252

>  

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 01-00710—James L. Graham, District Judge.

Argued: October 27, 2004

Decided and Filed: April 18, 2005

Before: KEITH, CLAY, and BRIGHT,[*] Circuit Judges.

_____

## COUNSEL

**ARGUED:** Kimberly M. Skaggs, EQUAL JUSTICE FOUNDATION, Columbus, Ohio, for
Appellant. Susan E. Ashbrook, COLUMBUS CITY ATTORNEY'S OFFICE, Columbus, Ohio, for
Appellees. **ON BRIEF:** Kimberly M. Skaggs, EQUAL JUSTICE FOUNDATION, Columbus,
Ohio, for Appellant. Susan E. Ashbrook, COLUMBUS CITY ATTORNEY'S OFFICE, Columbus,
Ohio, for Appellees.

_____

## OPINION

_____

      CLAY, Circuit Judge. Plaintiff Hazel Golden appeals the judgment below, in which the
district court: (1) granted summary judgment to Defendants the City of Columbus, Ohio, and the
City's Director of Public Utilities, Cheryl Roberto[1] (collectively the "City") on Golden's claims that

---

[*] The Honorable Myron H. Bright, Circuit Judge of the United States Court of Appeals for the Eighth Circuit,
sitting by designation.

[1] At the time Golden filed this action, the Director of Public Utilities was John Doutt. Golden sued Doutt in
his official and personal capacities. The district court dismissed the claims against Doutt in his personal capacity, a
decision Golden does not appeal. After Doutt retired, the district court substituted his replacement, Cheryl Roberto, as

the City's denial of water service to tenants whose predecessors left delinquent water accounts at the premises violates the Due Process Clause of the Fourteenth Amendment and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.* (the "ECOA"); (2) dismissed Golden's claim that the same constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment; and (3) dismissed Golden's motion for class certification. For the following reasons, we REVERSE the district court as to Golden's equal protection claim and AFFIRM as to her due process, ECOA, and class certification claims.

## BACKGROUND

Prior to 1991, the City of Columbus, Ohio, permitted both tenants and landlords to contract for water service. Although the landlord would be ultimately liable for unpaid water bills, a tenant could establish a water account in her own name by directly contracting with the City. In 1990, officials at the City's Department of Public Utilities became concerned that permitting tenants to directly contract for water service had the effect of impeding the collection of unpaid water bills. The City code at the time did not require either the City or the contracting tenant to notify the landlord when an account was created, or when an account became delinquent. Landlords complained when they were left to settle accounts they never knew were delinquent after the nonpaying tenants had vacated. These complaints caused further delays in payment. City utilities officials concluded that the City could better insure efficient payment of water bills if it alerted landlords to delinquencies as they occurred.

Utilities officials also lamented the fact that the City code did not authorize the City to deny service at premises encumbered by delinquent accounts. If a tenant vacated an apartment, leaving a delinquent account, the code nevertheless permitted a new tenant to move in and establish a new water account, even if the landlord had not yet satisfied the delinquency. Officials concluded that this frustrated bill collection by depriving the City of its most effective bill collection tool. With these problems in mind, the Columbus City Council amended the code in 1991. As amended, the pertinent sections now read:

> The [City] will directly bill a tenant for water and sewer service if the property owner, or authorized agent of the property owner, along with the tenant, sign a written agreement authorizing direct billing of the tenant. Once a written agreement is signed, the [City] will simultaneously mail, to both the owner and the tenant, copies of any bills and notices concerning delinquent water and sewer charges. . . .
>
> Direct billing of a tenant shall be in no way construed as to relieve the owner of the real estate premises of liability for water and sewer service charges. No direct billing of a tenant will be allowed where all delinquent water and sewer charges are not paid in full up until the date the direct billing agreement is accepted by the [C]ity, or where water or sewer service has been terminated for real estate premises.

Columbus City Code §§ 1105.045(D), (E) (the "policy" or "City's policy").

Plaintiff Hazel Golden moved into a single-family residence at 2209 Hamilton Avenue in Columbus in either October or December of 2000.[2] The lease between Golden and her landlord,

---

a defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

> [2] The record is unclear as to precisely when Golden moved in. In her deposition, Golden said that she moved in "[a]pproximately October of 2000." (J.A. at 662.) Yet the lease between Golden and her landlord is dated December 17, 2001. *Id.* at 687. This date cannot be correct since Golden's claims all relate to terminations of water service at the 2209 Hamilton Avenue residence during early 2001. Adding to the confusion, the City cites October 2000 as the date

David Matthews, states that the tenant is responsible for the payment of all utilities. However, according to Golden, her rent included water service while she was to pay separately for gas and electricity. At the time Golden began renting from Matthews, he was party to a direct billing agreement with the prior tenant, Sarah Dean, which Dean and Matthews had entered into pursuant to the City's policy.

Starting in late December 2000, the City began sending bills and notices to 2209 Hamilton Avenue addressed to "Sarah E Dean." On December 28, 2000, the City sent a Notice of Delinquency for service provided to Sarah Dean between August 10, 1999 and November 7, 2000. This was followed on February 12, 2001, by a Water Turn-Off Notice; on February 16, 2001, by a bill; on February 22, 2001, by another bill; and on March 8, 2001, by termination of water service to the residence. Service recommenced on March 9, 2001, at the request of the City's Code Enforcement department. Golden alleges that she contacted Code Enforcement after first contacting the City, which explained to her that under the policy, water service would not be restored until the account was paid. This pattern repeated itself during March and early April, with the City again terminating water service on April 9, 2001, and recommencing it the next day at the request of Code Enforcement. The City terminated service for a third time on April 23, 2001. Golden maintains that the termination permanently deprived her of water service while the City maintains that it recommenced service on May 9, 2001 without interruption until October 2001 when Golden moved out.

Each of the mailings sent to Golden's residence during the period December 2000 through May 2001 arrived in an enveloped marked "THIS IS YOUR WATER BILL." *See* J.A. at 157, 161. Each notice of delinquency and turn-off notice explains that customers have a right to request a hearing to contest the termination of service but this information is printed on the notice itself, not on the envelopes. The City's Water Customer Service Coordinator, Susan Young, stated in an affidavit that on February 2, 2001, the City sent a bill or a notice addressed to "Water Customer." J.A. at 158. The City does not dispute that all other bills and notices were addressed to "Sarah E Dean."

Matthews and Golden signed a direct billing agreement on March 16, 2001. Golden maintains that she sent the agreement to the City but received no response. J.A. at 737-38 (Golden Depo.). In any event, Matthews apparently did not pay the balance Dean owed – which would have been necessary to make Golden eligible for direct billing under the policy – and the record reflects that bills and notices sent after March 16, 2001 were still addressed to Dean. *See* J.A. at 158-75. Finally, Golden admits that the City left a notice of shut-off on her door contemporaneous with terminating service but alleges that the notice did not inform her of a right to contest the termination of service.

## PROCEDURAL HISTORY

On July 25, 2001, Golden and an earlier plaintiff, Nikki Mara, filed a class-action complaint in district court. The complaint, brought under 42 U.S.C. § 1983, alleged that the City's practice of terminating tenants' water service without notice and the possibility of a hearing amounted to a denial of tenants' Fourteenth Amendment right to procedural due process. The complaint further alleged that the City's policy, which denies water service to premises encumbered by delinquent accounts, violated tenants' rights under the Equal Protection Clause of the Fourteenth Amendment and under the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq*. The complaint also alleged that the City's termination of plaintiffs' water service constituted a breach of the City's

---

Golden moved in, Brief of Appellee at 4, while Golden relies on December 17, 2000. Brief of Appellant at 4. Inexplicably, the district court concluded that Golden began renting on January 17, 2001. (J.A. at 62).

common law duty to serve; Golden does not appeal the district court's dismissal of this claim. The relief sought in plaintiffs' complaint included a declaratory judgment and damages. The original plaintiffs filed a motion for class certification, the denial of which Golden appeals. Additionally, Golden appeals the grant of summary judgment to the City on her procedural due process and ECOA claims and the dismissal of her equal protection claim.

## DISCUSSION

### I.     Due Process

#### A.     *Standard of Review*

This Court reviews a district court's decision to grant summary judgment *de novo*. *E.g., Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001). Summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The district court, and this Court in its review of the district court, must view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Accordingly, we view the facts in the light most favorable to Golden.

#### B.     *Merits of the Due Process Claim*

The text of the Fourteenth Amendment's Due Process Clause makes clear that the state need not afford due process every time it takes an action that impacts negatively on citizens' lives. The amendment makes a narrower guarantee: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. Golden contends that the City denied her due process because her expectation of continued water service is "property" within the meaning of the Due Process Clause; alternatively, she asserts that water is a "basic necessity [of] life" and all necessities of life are "property." Brief of Appellant at 13-16. The district court rejected both theories.[3] The court found that Golden did not enjoy a contractual relationship with the City to support a claim of entitlement; nor could she point to a statute that created such an entitlement. (J.A. at 78.) Finally, the court dismissed Golden's "basic necessity for life" rationale, concluding that whether water is "a basic necessity for life is irrelevant to the question of whether water service is a property interest under the Fourteenth Amendment." *Id*. at 87.

In the absence of a claim that governmental action impinged on the other interests it protects – life and liberty – it is well established that the Due Process Clause of the Fourteenth Amendment regulates only those "actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978); *see also Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972). But while the Constitution does unequivocally protect "property," nowhere does it define the term. To resolve this question, as the Supreme Court held in the seminal case of *Board of Regents v. Roth*, the courts are to turn elsewhere: "Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577. Thus for Golden to have a constitutionally recognized property interest in the benefit of water service, she "must have more

---

[3] In her complaint, Golden did not plead that she had a property interest in water service; in its answer, the City did not raise the issue either. But the district court instructed the parties to prepare supplemental briefs on the question. (J.A. at 17-18.)

than an abstract need or desire for it[,] . . . more than a unilateral expectation of it. [She] must, instead, have a legitimate claim of entitlement to it." *Id*. The Supreme Court has identified two bases for such non-unilateral legitimate claims of entitlement: state statutes and contracts, express or implied, between the complaining citizen and the state or one of its agencies. *Id*. at 577-78; *see also Perry v. Sinderman*, 408 U.S. 593, 601-602 (1972) (recognizing an express or implied contract as sufficient to support a legitimate claim of entitlement); *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (recognizing a state welfare code as supporting a legitimate claim of entitlement).

Golden concedes that she is not a customer and therefore does not enjoy a contractual relationship with the City for the provision of water services. Brief of Appellant at 12, 14. Instead she relies on the Supreme Court's decision in *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978), for the proposition that all inhabitants of a city, even those who are not customers of the public utility provider, have a legitimate claim of entitlement to provision of utility service. Brief of Appellant at 13. This interpretation of *Craft* is off the mark. In *Craft*, the Court considered utility customers' procedural due process claim against the City of Memphis for terminating the customers' service without affording them an opportunity to contest charges about which there was a bona fide dispute. *Craft*, 436 U.S. at 5. The Court found in favor of the complaining customers, because "[i]n defining a public utility's privilege to terminate for nonpayment of proper charges, Tennessee decisional law draws a line between utility bills that are the subject of a bona fide dispute and those that are not." *Id*. at 9. A thorough review of Tennessee case law, *see id*. at 9-11, revealed that the state only permitted termination of service because of non-payment of undisputed charges and that "[a]n aggrieved customer may be able to enjoin a wrongful threat to terminate, or to bring a subsequent action for damages or a refund." *Id*. at 11. The availability of "such local-law remedies" to utility customers who dispute charges in good faith "is evidence of the State's recognition of a protected interest." *Id*. Thus *Craft* is plainly limited to utility customers; moreover, as *Roth* requires, the decision is completely determined by state law. *See generally id*.; *see also Myers v. City of Alcoa*, 752 F.2d 196, 198 (6th Cir.) (recognizing that the holding in *Craft* depended entirely on Tennessee law), *cert. denied*, 474 U.S. 901 (1985).

Golden's reliance on a decision of this Court, *Mansfield Apartment Owners Ass'n. v. City of Mansfield*, 988 F.2d 1469 (6th Cir. 1993), is similarly misplaced. In *Mansfield*, this Court cited *Craft* for the point that "[i]t is well settled that the expectation of utility services rises to the level of a 'legitimate claim of entitlement' encompassed in the category of property interests protected by the due process clause." *Id*. at 1474 (citing *Craft*, 436 U.S. at 10). But as the district court below observed, the complainants in *Mansfield* were property owners who had accounts with the City of Mansfield's utility department; it was appropriate, therefore, for the *Mansfield* Court to apply *Craft*. Without evidence of a contractual relationship between Golden and the City, or of a statutory entitlement to water service, it is not appropriate to do so here. But Golden presents no such evidence, which, at least as to the existence of a contract, is not surprising. The City's policy, established by the 1991 amendment to the Code, effectively barred Golden from establishing a contract with the City until Matthews paid the balance left unpaid by Dean. Indeed, it is abundantly clear that Matthews is to blame for Golden's predicament and ought to have been held to account under Ohio's landlord-tenant law.[4] If Golden's representation of the lease terms is true, Matthews

---

[4] Golden stated in an affidavit that she called the City when she first moved into the house at 2209 Hamilton Avenue in order to transfer the water account from Sarah Dean's name to her name. J.A. at 736 (Golden Depo.). The City sent her a direct billing agreement and informed her that she and Matthews would need to sign it. *Id*. at 736-37. The record does not reflect when Golden received the agreement from the City, but it is clear that the signed agreement is dated March 16, 2001. *Id*. at 691. Further, Golden maintains that she sent the completed agreement back to the City as instructed but received no response. *Id*. at 738. It is undisputed, however, that Golden received bills and notices from December 28, 2000 through mid-March 2001 addressed to Sarah Dean. Although she did not contact the City when a bill or notice came in the mail, Golden maintains that she would call Matthews whenever she received one; his response would be a promise to come by and pick the bill or notice up, but according to Golden, "it got to the point where he didn't [pick them up]." *Id*. at 739. The parties do not dispute that Matthews never paid the amount owed by Dean, nor

reneged on his promise to pay for water out of her rent. Further, it is undisputed that the City Code makes Matthews liable for delinquent accounts at premises he owns. *See* Columbus City Code § 1105.045(E). However, a landlord's failure to uphold his end of a bargain, even coupled with his failure to comply with a city's code provision regarding the payment of water bills, does not constitute a violation of the Due Process Clause by the city.

As to the second possible foundation for a property interest cognizable under the Fourteenth Amendment – state statutory or common law – Golden cites to no Ohio statutes or case law in support of her argument that she has a legitimate claim of entitlement to water service. We observe *infra* that other circuits have held certain provisions common to landlord-tenant statutes to be sufficient for this purpose. This circuit has not yet considered such an argument. We have applied *Craft* in a case involving the due process claims of property owners who were water customers. *See Mansfield*, 988 F.2d at 1473-74 (holding that customers' expectation of continued utility service constituted a protected property interest). And, in an unpublished opinion one year before *Mansfield*, we were similarly faithful to *Craft*, rejecting a homeowner's claim that Ohio law guaranteed water services to its residents. *Cadle v. City of Newton Falls*, No. 91-3717, 1992 WL 88904, *4-5 (6th Cir. 1992) (unpublished opinion). But neither *Mansfield* nor *Cadle* offers guidance on whether a tenant who is precluded from directly contracting for water service and from obtaining water service at all, due to nonpayment by both the prior tenant and the landlord, may state a claim for deprivation of a property interest without due process of law.

In two cases, the Eleventh Circuit has held that tenants may state such a claim under provisions of Florida's landlord-tenant law. *See James v. City of St. Petersburg*, 33 F.3d 1304, 1306-1307 (11th Cir. 1994) (*en banc*) (finding a protectable property interest based on Florida law to the effect that a landlord could not terminate a tenant's utility service but finding that because neither tenant nor landlord had established a contract with the utility, which either were allowed to do, the interest did not attach); *DiMassimo v. City of Clearwater*, 805 F.2d 1536, 1539-40 (11th Cir. 1986) (finding a property interest because "it is clear that Florida's Landlord and Tenant Act . . . would not sanction the withdrawal of water services from . . . tenants by their landlords because such action would constitute either the failure to provide necessary facilities for sustaining life or the constructive eviction of tenants contrary to statutory directives for such action"). The Ninth Circuit has issued a similar ruling pursuant to provisions of Oregon's landlord-tenant law. *See Turpen v. City of Corvallis*, 26 F.3d 978, 979 (9th Cir.), *cert. denied*, 513 U.S. 963 (1994). These circuits have taken the novel approach of recognizing a property interest in a tenant's right – under landlord-tenant law – to bring an action to enjoin her landlord from constructively evicting her by terminating water service or declining to pay for it. *Dimassimo*, 805 F.2d at 1539; *Turpen*, 26 F.3d at 979. Depriving tenants of this important remedial right by failing to give proper notice before water service terminates, the courts reasoned, is a due process violation. *Dimassimo*, 805 F.2d at 1539; *Turpen*, 26 F.3d at 979.

We express no opinion as to whether these precedents weigh in Golden's favor because Golden does not rely upon any provisions of Ohio's landlord-tenant law in this appeal, nor did she do so in the district court. Despite the clear command of the Supreme Court's cases regarding what constitutes a cognizable property interest for Fourteenth Amendment purposes, Golden rests her case on the bare assertion that because water is "an absolute necessity of life," the City's termination of her service was unconstitutional. As much as we may agree with Golden's premise as a policy matter, the law precludes us from adopting her conclusion. As support for the necessity-of-life rationale, Golden relies on the now-discredited case of *Koger v. Guarino*, 412 F. Supp. 1375 (E.D. Pa. 1976), in which the district court flatly stated, without support, that "water service is an entitlement to which the requirements of due process attach." *Id*. at 1384. *Koger* appears to be the

---

apparently the amount charged to the residence while Golden was a tenant there.

only reported federal case standing for such a proposition. Although Golden invokes *Davis v. Weir*, 497 F.2d 139 (5th Cir. 1974) for the same point, the city in that case conceded that "due process demands pre-termination notice to the actual user [of water]." *Id*. at 143. In *Davis*, therefore, the Fifth Circuit did not consider whether the mere use of water service, without more, constitutes a legitimate claim of entitlement to continued service for purposes of the Fourteenth Amendment. *Id*. at 143. In any event, it is clear that the plaintiff in *Koger* contested the termination of his water service on substantive, rather than procedural, due process grounds. *See Koger*, 412 F. Supp. at 1383-84. Moreover, the Third Circuit rejected *Koger*'s substantive due process analysis in *Ransom v. Marrazzo*, 848 F.2d 398 (3d Cir. 1988), concluding that a municipality's denial of water service, if it implicates any federal right, implicates only the procedural protections of the Fourteenth Amendment, not its substantive guarantees.[5] *See Ransom*, 848 F.2d at 411-12.

In conclusion, we return to the Supreme Court's command in *Roth*: "Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understanding that stem from an independent source such as state law–rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577. While there may be relevant "rules or understandings" under Ohio law, *see* discussion *supra*, Golden does not point us to any. Because she bears the burden of doing so, we affirm the district court's grant of summary judgment to the City on this claim.[6]

## II.          Equal Protection

### A.          Standard of Review

We review the dismissal of a claim under FED. R. CIV. P. 12(b)(6) *de novo*. *E.g.*, *Gao v. Jenifer*, 185 F.3d 548, 552 (6th Cir. 1999). A motion to dismiss for failure to state a claim is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations. *Id*. Thus this Court must assume that all allegations are true and dismiss the claim "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," i.e., that the legal protections invoked do not provide relief for the conduct alleged. *Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir. 1996) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)); *see also Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In addition, "while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 -1110 (6th Cir. 1995) (citing *Allard v. Weitzman (In Re DeLorean Motor Co.)*, 991 F.2d 1236, 1240 (6th Cir. 1993)). "In practice, 'a ... complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory.'" *Allard*, 991 F.2d at 1240 (quoting *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988)); *see also Ana Leon T. v. Federal Reserve Bank,* 823 F.2d 928, 930 (6th Cir.) (*per curiam*) (holding that the statement of mere legal conclusions is not entitled to liberal Rule 12(b)(6) review), *cert. denied,* 484 U.S. 945 (1987).

---

[5] The *Ransom* court did not consider the plaintiffs' procedural due process claims because they were moot. *See Ransom*, 848 F.2d at 409-11.

[6] Because Golden has not demonstrated that she was deprived of a property interest within the meaning of the Fourteenth Amendment, we need not determine whether the City afforded her due process prior to terminating water service to her residence.

B.          *Merits of the Equal Protection Claim*

Golden's complaint asserts an equal protection claim in rather general terms: "Defendants . . . violated Plaintiffs' right to equal protection under the Fourteenth Amendment . . . ." J.A. at 12 (Compl. ¶ 60). The pertinent factual allegations are similarly general: "Defendants have established policies and customs and/or patterns and practices of requiring Plaintiffs and other consumers of and applicants for water service to comply with conditions different from similarly situated customers in order to restore water service, including but not limited to refusing to provide water service accounts to applicants who are not landowners." *Id.* (Compl. ¶ 56). The City contends that the district court properly dismissed the claim because the only dissimilar treatment it can be read to allege is dissimilar treatment as between landlords and tenants. Because landlords and tenants are not similarly situated, the City's argument runs, Golden's complaint fails to state a claim upon which relief can be granted. It is true that the district court dismissed Golden's complaint in part on this basis. However, the remainder of the district court's analysis belies the City's contention that the complaint only alleges dissimilar treatment as between tenants and landlords.

The district court's opinion demonstrates that it dismissed Golden's claim on the assumption that the complaint alleged two forms of discrimination – first, as between tenants and landlords and, second, as between those tenants whose circumstances permitted them to enter direct billing agreements and those whose circumstances did not. *See* J.A. at 69-74. We think the district court's reading of the complaint was reasonable. Indeed, the parties apparently read the complaint in the same broad fashion; both parties briefed the tenant versus tenant classification as well as the tenant versus landlord classification in their motions before the district court. *See* J.A. at 111-15 (Defendant's Motion for Partial Dismissal), 208-10 (Plaintiff's Motion in response). In the end, the district court considered, and dismissed, Golden's equal protection claim under both theories. *See id.* at 69-74. We note that in the context of determining whether a § 1983 plaintiff has adequately pleaded the capacity in which she seeks to hold the defendant liable, we employ a "course of proceedings" test such that our interpretation of the complaint will be informed by the manner in which the parties and the district court interpreted it. *Moore v. City of Harriman*, 272 F.3d 769, 772-73 (6th Cir. 2001) (*en banc*), *cert. denied*, 536 U.S. 922 (2002). We decline, therefore, to accept the City's representation that Golden alleges dissimilar treatment as between two classes of tenants for the first time on appeal, *see* Brief of Appellee at 19, for this would be obviously inconsistent with the course of the proceedings so far. We read the complaint as alleging that the City treated two classes of tenants dissimilarly and two classes of residents, tenants and landlords, dissimilarly. We hold that, as to the former theory, Golden states a claim upon which relief can be granted under our case law.

Several circuits, including ours, have considered whether the Equal Protection Clause permits a municipality to deny water service to a residence where the prior inhabitant failed to pay water bills. *See O'Neal v. City of Seattle*, 66 F.3d 1064 (9th Cir. 1995); *Ransom v. Marrazzo*, 848 F.2d 398 (3d Cir. 1988); *DiMassimo v. City of Clearwater*, 805 F.2d 1536 (11th Cir. 1986); *Sterling v. Vill. of Maywood*, 579 F.2d 1350 (7th Cir. 1978), *cert. denied*, 440 U.S. 913 (1979); *Craft v. Memphis Light, Gas & Water Div.*, 534 F.2d 684 (6th Cir. 1976), *aff'd on other grounds*, 436 U.S. 1 (1978); *Davis v. Weir*, 497 F.2d 139 (5th Cir. 1974). Because there is no fundamental right to water service, *see* discussion *supra* Part I; *see also Mansfield Apartment Owners Ass'n v. City of Mansfield*, 988 F.2d 1469, 1477 (6th Cir. 1993), we apply rational basis scrutiny to the City's water policy. *O'Neal*, 66 F.3d at 1067; *Dimassimo*, 805 F.2d at 1541.

Golden alleges that the City's policy irrationally treats one group of tenants (those whose landlords owe the City for water service) differently from another group of tenants (those whose

landlords do not).**7** Brief of Appellant at 21. According to Golden, the City's classification scheme has a determinative effect on a tenant's chances of securing water service. One class established by the City's policy is comprised of tenants who move into properties where there is no unpaid balance on the water account; these tenants will receive water service. The other class is comprised of tenants whose properties are encumbered by the water debts of the prior tenant; these tenants will be deprived of water service until they or their landlords, who are liable for the debt, pay the amount owed. Although it is true that *no* tenant in the City may establish a direct billing agreement with the City without first securing her landlord's consent, *see* Columbus City Code § 1105.045(D), Golden maintains that the City's policy nevertheless divides tenants in an irrational manner because it denies water service only to those tenants whose predecessors or landlords failed to pay the water bills. We agree.

This Court held nearly thirty years ago that a water service policy in Memphis, similar to the policy at issue here, violated water applicants' equal protection rights by irrationally dividing applicants into those who were permitted to contract for water and those who were not. *Craft v. Memphis Light, Gas & Water Div.*, 534 F.2d 684, 689-90 (6th Cir. 1976), *aff'd on other grounds*, 436 U.S. 1 (1978). In *Craft*, the dividing line between applicants permitted to contract for service and applicants not permitted to contract was whether a water applicant's predecessor owed an unpaid balance at the property; if so, the applicant could not establish an account until the debt was paid. *Craft*, 534 F.2d at 689. In *Craft*, this Court relied on the then-contemporary Fifth Circuit case of *Davis v. Weir*, 497 F.2d 139 (5th Cir. 1974), which invalidated an analogous Atlanta policy. *Davis*, 497 F.2d at 144-45. The *Davis* court concluded that "the Water works has divided those who apply for its services into two categories: applicants whose contemplated service address is encumbered with a pre-existing debt (for which they are not liable) and applicants whose residence lacks the stigma of such charges." *Id*. at 144. The court rejected Atlanta's defense that its policy facilitated the collection of unpaid bills at apartment buildings, holding that "[t]he City has no valid governmental interest in securing revenue from innocent applicants who are forced to honor the obligations of another or face constructive eviction from their homes for lack of an essential to existence – water." *Id*. at 145. The court acknowledged that Atlanta's policy facilitated debt collection but concluded that "[a] debt collection scheme . . . that divorces itself entirely from the reality of legal accountability for the debt involved, is devoid of logical relation to the collection of unpaid water bills from the defaulting debtor." *Id*. at 144-45.

The *Davis* court's reasoning remains intact in the Fifth Circuit, was adopted by this circuit in *Craft*, and has been adopted by the Ninth and Seventh Circuits. *See O'Neal v. City of Seattle*, 66 F.3d 1064, 1067-1068 (9th Cir. 1995); *Sterling v. Vill. of Maywood*, 579 F.2d 1350, 1355 (7th Cir. 1978). At least one circuit, the Third, has rejected *Davis*, concluding that "the classification of service eligibility according to the presence or absence of encumbrances on the property [survives] rational relationship scrutiny" because while it may be an irrational means of collecting debt from the *debtor*, it is a rational way of accomplishing "the more general goal of collecting debts, period." *Ransom v. Marrazzo*, 848 F.2d 398, 412-13 (3d Cir. 1988). Having the benefit of both the Third and Fifth Circuits' approaches to consult, the Ninth Circuit "reject[ed] the *Ransom* court's technical narrowing of the legislative purpose and agree[d] with the Fifth Circuit's opinion in *Davis*." *O'Neal*, 66 F.3d at 1067-68.

Even if we preferred the Third Circuit's approach to the question, we are bound by *Craft*, as that case is still good law in this circuit. Nevertheless, the City asserts that its policy is materially distinguishable from those at issue in *Craft*, *Davis*, and *O'Neal*. The City contends that "the only classification [its policy] makes is between property owners and tenants." Brief of Appellee at 20.

---

**7** Even if the prior tenant had a direct billing agreement with the City, the landlord is ultimately liable for any unpaid water bills. Thus, any amounts owed to the City at the time that a new tenant moves in are owed by the landlord.

According to the City, all tenants are treated equally since all tenants must obtain their landlords' consent before establishing a direct billing agreement. The City further argues that its policy does not require tenants to pay bills for which they are not liable; instead, the policy imposes financial liability on landlords only. These points, while true, are irrelevant. The critical issue is whether terminating a tenant's water service is a rational means of collecting the landlord's water service debt. We hold that it is not.

We do not see a meaningful distinction between the policy before us and those held unconstitutional in *Craft*, *Davis*, *Sterling*, and *O'Neal*. Moreover, to the extent there are distinctions, we see no reason to depart in this case from the Fifth Circuit's rationale in *Davis* – a rationale which we adopted as our own in *Craft*.[8] In practical terms, as Golden's own experience shows, the City's policy works as follows. A tenant moves into an apartment; water is available at the time the tenant moves in, so there is no reason for the tenant to question its future availability. However, at some point later the City terminates water service to the residence for the sole reason that the landlord owes the City for the prior tenant's water usage. When the new tenant inquires with the City, she learns that water service will recommence only once her landlord has satisfied the debt that he alone owes. This is a debt collection scheme "that divorces itself entirely from the reality of legal accountability for the debt involved," *Davis*, 497 F.2d at 144-45, because the person directly penalized by the scheme is not the debtor but an innocent third party with whom the debtor contracted.

The City submits that because the policy does not explicitly require tenants to pay their predecessors' debts, but instead imposes that obligation on landlords, it is constitutional. Whether the City's goal is that it be repaid by the person who owes the debt or by the tenant who is directly affected by its collection scheme is immaterial for constitutional purposes. Neither goal gives "the City license to pursue payment by refusing water service to an unrelated, unobligated third party, whether that third party be the new tenant or any other stranger to the prior service agreement." *O'Neal*, 66 F.3d at 1068. We conclude, as the Ninth Circuit did in *O'Neal*, that "[p]ursuing payment from the prior tenant and the landlord would be rationally related to the City's goal; refusing service to an unobligated new tenant is not." *Id.* To be sure, the City has at its disposal various means to recover from the landlord or the prior tenant without jeopardizing the new tenant's water service. In fact, after the events that prompted Golden to bring this action, the City implemented one obvious approach. Under a rule adopted by the Director of Public Utilities, tenants facing termination of water service – or, we may assume, seeking to reinstate service already terminated – may pay their rent into an escrow account maintained by the Municipal Court for Franklin County.[9] We express no opinion as to whether the particulars of this new rule pass constitutional muster;[10] we refer to

---

[8] In addition, we are not persuaded by the Eleventh Circuit's equal protection rationale in *Dimassimo v. City of Clearwater*, 805 F.2d 1536 (11th Cir. 1989), a case the City urges us to follow. In *Dimassimo*, the court rejected an equal protection claim similar to Golden's. The Eleventh Circuit did not consider our opinion in *Craft*, nor the Fifth Circuit's opinion in *Davis*. For the reasons stated in our discussion, we adhere to those opinions.

[9] A 2002 version of the rule is reprinted in the Joint Appendix. *See* J.A. at 603-605 (City of Columbus Dep't of Pub. Utils. Rule and Regulation No. 2002-01).

[10] Neither do we construe this new rule as mooting the present controversy. We have no way of knowing whether the new rule is permanent or temporary and the City does not contend that it moots Golden's equal protection claim. As a general rule, "'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice' unless it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Buckannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 609 (2002) (quoting *Friends of the Earth, Inc., v. Laidlaw Environmental Servs., Inc.*, 528 U.S. 167, 189 (2000)). "[A] heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again *lies with the party asserting mootness*." *Adarand Const., Inc. v. Slater*, 528 U.S. 216, 222 (2000). Because the City does not assert mootness, it follows that its adoption of the new rule does not moot Golden's equal protection

it only to illustrate that cities in this circuit are not without means to recover water service debts merely because the Equal Protection Clause of the Fourteenth Amendment bars them from terminating the water service of a tenant whose landlord owes water bills.

## III.     Equal Credit Opportunity Act

### A.        *Standard of Review*

The district court granted summary judgment to the City on Golden's ECOA claim. We therefore review the district court's judgment on this point *de novo*. *E.g.*, *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001). In addition, we view the relevant facts in the light most favorable to Golden. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.        *Merits of the ECOA Claim*

Golden asserts that the policy, which authorizes direct billing of a tenant only if (1) the landlord agrees in writing and (2) any existing balance on the account is immediately paid, violates the ECOA, 15 U.S.C. § 1691(a)(1). Golden's theory of liability is that the policy has the effect of rejecting a higher proportion of female and minority applicants for water service than other applicants. *See* Brief of Appellant at 24. This theory is based on the findings of Golden's expert witness to the effect that women and minorities are under-represented in the population of homeowners in the City. According to Golden, because the policy permits only homeowners to directly contract for water service, the policy has a disparate impact on anyone who is under-represented among homeowners. The district court assessed the statistical evidence furnished by the expert in support of Golden's disparate impact claim and concluded that this evidence did not make the type of comparison necessary to state such a claim. Finding that Golden had failed to make out a *prima facie* case of disparate impact discrimination, the court granted summary judgment to the City. We affirm.

The ECOA provides, in relevant part: "It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction on the basis of race, color . . . sex or marital status." 15 U.S.C. § 1691(a)(1). We make the following assumptions for purposes of resolving Golden's ECOA claim. First, we assume that Golden is an applicant, that the City is a creditor, and that a transaction for water service is a credit transaction. Second, we assume that disparate impact claims are permissible under ECOA.[11]

To prove her claim that the City's policy has a disparate impact on women and minorities, Golden must show that the policy "has a significantly greater discriminatory impact on [women and minorities]." *A.B. & S. Auto Service, Inc. v. South Shore Bank of Chicago*, 962 F. Supp. 1056, 1060 (N. D. Ill. 1997) (citation omitted). The conventional way to do this is "to compare representation of the protected class in the applicant pool with representation in the group actually accepted from

claim.

[11] Neither the Supreme Court nor this Court have previously decided whether disparate impact claims are permissible under ECOA. However, it appears that they are. *See Coleman v. General Motors Acceptance Corp.*, 196 F.R.D. 315, 325-26 (M.D.Tenn. 2000), *modified on other grounds*, 296 F.3d 443 (6th Cir. 2002) (discussing cases in the federal district courts, one court of appeals case, and ECOA's legislative history and concluding that "there is clear support for the use of a disparate impact theory in an ECOA case"). *See also* S. Rep. No. 94-589 (instructing that "judicial constructions of anti-discrimination legislation in the employment field," such as in cases where the Supreme Court has sustained disparate impact claims, should serve as guidelines in ECOA cases); Gwen A. Ashton, *The Equal Credit Opportunity Act from a Civil Rights Perspective: The Disparate Impact Standard*, 17 ANN. REV. BANKING L. 465, 478-81 (1998).

the pool." *Cherry v. Amoco Oil Co.*, 490 F. Supp. 1026, 1030 (N. D. Ga. 1980). "If the statistical disparity is significant, then [the] plaintiff is deemed to have made out a *prima facie* case." *Id*. In some cases, a plaintiff may rely on general population characteristics if it is reasonable to assume that the applicant pool is representative of the general population. However, "this assumption is not valid in every case. Plaintiff must demonstrate why the use of general population statistics would be valid." *A.B.& S. Auto Service, Inc.*, 962 F. Supp. at 1061 (citing *Cherry*, 490 F. Supp. at 1031 n. 9).

From what we are able to discern, Golden has not attempted to identify the actual applicant pool for water service in Columbus and has instead relied upon characteristics of the City's general population. As just mentioned, this approach is permissible in cases where the plaintiff demonstrates that any possible applicant pool would be representative of the population as a whole. Golden has not offered evidence or argument on this score. Golden relies on the work of an expert whose conclusion that the City's policy has a disparate impact on women and minorities depends on which groups of residents he chose to compare. Without explanation or citation to authority, Golden contends that it was appropriate for the expert to compare the demographics of all renters to the demographics of all homeowners as a proxy for a comparison between the actual pool of applicants for water service in Columbus and the subset of the pool who succeed in securing service. We disagree.

The parties agree on two critical points: first, in order to be eligible to apply for water service, an applicant must live in a residential unit – whether a house or an apartment – that has its own water meter; and, second, those eligible to apply for water service without needing to secure anyone else's approval include not only people who own residences with water meters but also those who live with people who own residences with water meters.[12] In reality, then, the applicant pool for water service in the City of Columbus is comprised of people who either rent a residence with a water meter, own such a residence, or live with someone who owns such a residence. Those who, all things being equal, will secure water service from the City without having to obtain another's approval are people who either own a residence with a water meter or live with the owner of such a residence. If there were a statistically significant disparity between the representation of women and minorities in the first group and their representation in the second group, a finding that the policy has a disparate impact on women and minorities would be appropriate. *E.g.*, *Cherry*, 409 F. Supp. at 1030. The expert's statistics do not address this question, however. The expert's comparison between all renters and all homeowners does not indicate one way or the other whether the proportion of women and minorities in the actual applicant pool is larger, in a statistically significant sense, than the proportion of women and minorities in the group of successful applicants. Moreover, Golden does not attempt to explain why the group of all renters is an accurate proxy for the actual applicant pool and the group of all homeowners an accurate proxy for the group of successful applicants for water service. We need not inquire further because the law requires Golden to proffer such an explanation. *See A.B.& S. Auto Serv.*, *Inc.*, 962 F. Supp. at 1062 (observing that plaintiff must show that the actual applicant pool bears "approximately the same characteristics as the general population surveyed"). We note parenthetically, however, that the group of all renters is obviously over-inclusive if designed to serve as a useful proxy for the actual applicant pool because it includes many renters who live in a large subset of residences that do not have individual water meters, i.e., apartments. In this respect, the expert's approach was not sensitive to a baseline qualification all applicants for water service in Columbus must meet. As the Supreme Court has said in the context of employment discrimination, "when special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value."

---

[12] The City denominates people who own residences with water meters as "heads of households." Golden does not dispute that the City contracts with people who live with heads of households, e.g., spouses of heads of households.

*Hazlewood Sch. Dist. v. United States*, 433 U.S. 299, 308 n.13 (1977). In addition, the expert's proxy for the group of successful applicants, i.e., all homeowners, is under-inclusive because it excludes a group of residents who are eligible to apply for water service without having to obtain approval from another, i.e., those who live with owners of residences that have water meters.

With these points in mind, we conclude that the comparison relied upon by the expert in fashioning Golden's disparate impact claim does not, at least not in a discernible way, indicate that the City's policy has a disparate impact on women and minorities. Since Golden does not attempt to illuminate any hidden meaning the expert's comparison may have, we must affirm the district court's grant of summary judgment to the City.

## IV.   Class Certification

### A.   *Standard of Review*

We review a district court's denial of class certification for abuse of discretion. *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003); *In Re American Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). As the party seeking class certification, Golden bears the burden of proof. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982); *In Re American Med. Sys., Inc.*, *supra*, at 1079.

### B.   *Merits of the Class Certification Claim*

As we reiterated recently, "[i]n order to obtain class certification, [a] plaintiff must first satisfy Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation." *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002). The district court concluded that Golden failed to prove numerosity. FED. R. CIV. P. 23(a)(1). This conclusion was not an abuse of the court's discretion; we therefore affirm.

To prove numerosity, Golden must demonstrate that the putative class is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). We have observed that "[t]here is no strict numerical test for determining impracticability of joinder." *In Re American Med. Sys., Inc.,* 75 F.3d at 1079 (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 523 n.24 (6th Cir.), *cert. denied*, 429 U.S. 870 (1976)). Indeed, "[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Northwest, Inc., v. EEOC*, 446 U.S. 318, 330 (1980). Nevertheless, while "the exact number of class members need not be pleaded or proved, impracticability of joinder must be positively shown, and cannot be speculative." *McGee v. East Ohio Gas Co.*, 200 F.R.D. 382, 389 (S. D. Ohio 2001) (quotation and citations omitted); *see also* 7A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1762 (3d Ed. 2001) (observing that the party seeking class certification "bear[s] the burden of showing impracticability and mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)").

With respect to Golden's equal protection claim – the only claim we sustain – the putative class of plaintiffs consists of tenants in Columbus whose water service was or will be terminated because of the landlord's or prior tenant's indebtedness. J.A. 9-10 (Compl.); 91 (Motion for Class Cert.). As proof of impracticability of joinder, Golden relies exclusively on one figure – the number of renters in Columbus, which, according to Golden, is 150,000. We have no reason to question this figure but we agree with the district court that merely referring to it does not suffice for purposes of proving numerosity under Rule 23(a)(1). Golden must offer something more than bare speculation to link the gravamen of her claim for liability to the class of individuals she purports to represent. The gravamen of Golden's equal protection claim is that the City irrationally terminates certain tenants' water service. Golden does not allege that *all* tenants in Columbus are at risk of constitutional harm, only those whose predecessors or landlords are indebted to the City. Thus, reference to the total number of tenants in Columbus is not probative of the number of tenants

reasonably likely to face the harm for which Golden seeks redress.  Of course, the total number of tenants in Columbus is probative in the very limited sense that it represents the absolute maximum number of plaintiffs that could be in any class action brought by a tenant against the City.  But the district court must engage in a "rigorous analysis" when evaluating the plaintiff's proof of numerosity, *see Falcon*, 457 U.S. at 161.  We cannot say the district court abused its discretion in concluding that such an unrefined measure as the total tenant population in Columbus is too speculative for purposes of the numerosity requirement.  *See Alkire*, 330 F.3d at 820 (holding that the plaintiff's hypothesis that hundreds of people might be unconstitutionally incarcerated for failure to pay civil debts or court costs was insufficient to prove numerosity); *Gevedon v. Purdue Pharma*, 212 F.R.D. 333, 337-38 (E. D. Ky. 2002) (holding, in a products liability case, that the total sales volume of the product in question is not in itself sufficient proof of numerosity).

Accordingly, we affirm the district court's denial of Golden's motion for class certification.

## CONCLUSION

We AFFIRM the district court's grant of summary judgment to the City with respect to Golden's claims under the ECOA and the Due Process Clause of the Fourteenth Amendment.  We similarly affirm the court's denial of the motion for class certification.  However, we REVERSE the district court's dismissal of Golden's equal protection claim.  Accordingly, we remand for proceedings consistent with this opinion.