NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0560n.06
Filed: August 4, 2006

No. 05-1416

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **Richard T. Arnold,** | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | |
| | ) | |
| **v.** | ) | **ON APPEAL FROM THE** |
| | ) | **UNITED STATES DISTRICT** |
| **Luedtke Engineering Co.,** | ) | **COURT FOR THE WESTERN** |
| | ) | **DISTRICT OF MICHIGAN** |
| **Defendant-Appellee.** | ) | |

Before: KEITH, COLE, Circuit Judges, and MIILS,* District Judge.

**DAMON J. KEITH, Circuit Judge.** Appellant, Richard T. Arnold ("Arnold"), appeals the district court's order granting summary judgment to Luedtke Engineering Co. ("Luedtke"), on Arnold's claim of negligence under the Jones Act, 46 U.S.C. § 688, and vessel unseaworthiness pursuant to general admiralty and maritime law, against his employer. The district court found that Arnold was not a "seaman" as defined by the Jones Act during his employment of reconstructing a seawall along the shore of the Erie Canal. We conclude, however, that the district court erred in employing a snapshot test for seaman status and improperly took the mixed question of law and fact away from the jury. Accordingly, we reverse the decision of the district court and remand this case for trial.

**I. Background**

---

* The Honorable Richard Mills, United States District Court for the Central District of Illinois, sitting by designation.

Luedtke is a maritime construction and dredging company involved in maintenance dredging, marina construction, and breakwall construction. Over the past twenty-three years, Arnold was employed with Luedtke in various capacities including runner, deckhand, tugboat pilot, and project foreman. Arnold, as part of his employment with Luedtke, was a member of the Seafarers International Union for over 20 years and licensed as a tugboat Captain.

## A. The Black Rock Lock Project

The events giving rise to this dispute occurred in September 2002 while Arnold was assigned as project foreman to a seawall reconstruction project at Black Rock Lock in Buffalo, New York. The seawall is 750 feet in length along the shore of the Erie Canal. From the waterside, the seawall is seven feet tall, however, from the beachside the wall is waist-level. Luedtke's task on the project, which took approximately nine months to complete, was to straighten the seawall and ensure that the material from the beach did not enter the canal. At the beginning of the project, five Luedtke employees were assigned to the job in addition to the Corp. of Engineers representative who was there daily. The project was constructed in four phases: (1) sheet piling, (2) stone placement behind the refurbished wall, (3) wedge plate attachment, and (4) concrete pouring. Arnold fully participated in the first two phases of the project and was injured during the end of the third phase. The project began in February 2002 and continued until November of that year. Arnold was injured at the end of September, at least seven months into the project and at most two months from the completion of the project.

There were three vessels that were used to complete the Black Rock Lock project: a tugboat, derrick boat, and floating work raft. The Luedtke tugboat was used to push the derrick boat to the

work site. Arnold was the Captain of the tugboat as it departed from Michigan to Buffalo, New York. The derrick boat is a one-hundred thirty foot by forty foot barge. It contains navigation lights, anchoring spuds, a galley, and sleeping quarters. While the derrick boat can be moved short distances by using an attached crane, the tugboat is generally utilized to transport it. During the first two phases of the project, the derrick boat was used to transport equipment and materials from one side of the lock to the other side. Additionally, the Luedtke employees placed a crane on the derrick boat in order to assist in the placement of the steel plates along the seawall. Finally, the floating work raft is a forty by six foot pontoon raft. The raft was moved around the seawall both manually by Arnold and, at other times, mechanically by a crane. The work raft was used as a platform from which Arnold could weld steel plates onto the seawall from the waterside.

Arnold's job duties at the Black Rock Project were varied. As project foreman he reported to the superintendent. He was also the tugboat captain. In addition to his foreman and captain responsibilities, he was responsible for overseeing the sheeting phase, pouring concrete behind the wall, tying rebar, setting tubes,[1] and finally welding wedge plates to each tube.[2] Arnold also was responsible for making repairs to the derrick boat and inspecting it every morning.

## B. The Accident

When the wedge plate phase began, between seven or eight months into the project, Luedtke had laid off or otherwise released/reassigned all other employees associated with the project aside

---

[1]The setting tubes would later hold the tendons necessary for anchoring the seawall.

[2] The wedge plates were driven from the new wall into the existing wall in order to anchor the new wall in place.

from Arnold and Rich Payment ("Payment"), another Luedtke employee. The third phase required Arnold to engage in welding one-hundred pound steel plates to the new seawall. In order to maneuver the plate into place along the seawall, first, Arnold would carry a plate by hand a short distance from the beach to the seawall. Then he would place the plate on top of the seawall, step on to the seawall and attach the plate to a cable jack, which lowered the plate into position on the waterside of the seawall. Finally, Arnold would lower himself onto the work raft where he would weld the plate into place.

While Arnold worked abroad the raft, Payment's job was to assist a separate construction company, which used the derrick boat to complete its part of the seawall. Arnold was in charge of piloting the tugboat when the construction company indicated that the derrick boat needed to be moved. According to Arnold, at a maximum he piloted the tugboat three to four times per day for an estimated fifteen to twenty minutes per tug during the four to five week welding phase. Arnold estimated that the longest tow he was required to make on this phase of the Black Rock Lock Project was three to four hundred feet. Testimony indicated that the Breyman construction company worked ten hours per day after which Payment would return to the raft and assist Arnold. It was during the course of the time Arnold was working alone that his injury allegedly occurred.

In early September 2002, Arnold began experiencing back pain while lifting the wedge plates. Arnold continued to work for approximately three more weeks until he could no longer get out of bed due to the pain. Arnold officially left the job on September 20, 2002 and Payment finished the wedge phase with another Luedtke employee within seven days. The entire project was completed in November 2002.

On October 14, 2002, Arnold underwent back surgery. Subsequently, his treating physician declared him unfit for his prior occupation. Pursuant to the employment contract with the Seafarer's Union, Luedtke paid Arnold $300 per week following his injury as maintenance and cure. Maintenance and cure is paid to injured members of the union by their employers. Thereafter, Arnold brought the present suit alleging negligence and vessel unseaworthiness under the Jones Act stemming from his injury while working on the seawall. The district court found that Luedtke was entitled to judgment as a matter of law because Arnold did not satisfy the two-prong *Chandris* test that the Supreme Court developed to determine the status of seaman under the Jones Act. *Chandris, Inc. v. Latsis*, 515 U.S. 347 (1995). Arnold filed a timely notice of appeal with this Court.

## II. Discussion

### A. Standard of Review

We review a district court's grant of summary judgment *de novo*. *Golden v. City of Columbus,* 404 F.3d 950, 954 (6th Cir.2005). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). An issue concerning a material fact is genuine if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We must review the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248.

**B. Analysis**

Prior to the passage of the Jones Act, general maritime law entitled a seaman, who became sick or injured to maintenance and cure (or the right to be cared for and paid wages during the voyage, *see, e.g.*, *Harden v. Gordon*, 11 F. Cas. 480, 482-483 (Story, J.)). He would also be entitled to damages for any "injuries received . . . in consequence of the unseaworthiness of the ship." *The Osceola*, 189 U.S. 158, 175 (1903). Actions brought against shipowners for negligence, however, were barred. Under the basic principles of assumption of risk, courts reasoned that when seaman signed a contract for employment they forego their basic common law tort remedies; thus a seaman was "not allowed to recover an indemnity for the negligence of the master, or any member of the crew." *Id.* In 1920, Congress enacted the Jones Act, which permitted a seaman to bring negligence suites. *See Chandris, Inc. v. Latsis,* 515 U.S. 347, 354 (1995).

The Jones Act provides, in pertinent part: "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury." 46 U.S.C.App. § 688(a). Additionally, in such actions "all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply." *Id*. Although the statute is silent on who is a "seaman," the Supreme Court, in *Chandris*, *Inc. v. Latsis*, 515 U.S. 347, 369 (1995) established two essential requirements for "seaman" status. To procure seaman status (1) "an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission;" and (2) "a seaman

must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature."*Id*. The first prong has been interpreted broadly to include, "all who work at sea in the service of a ship." *Id.* In analyzing the second prong, the Supreme Court advises that "the total circumstances of an individual's employment must be weighed to determine whether he had a sufficient relation to the navigation of vessels and the perils attendant thereon." *Id*. at 370.

Further, the Supreme Court cautioned that when "evaluating the employment-related connection of a maritime worker to a vessel in navigation, courts should not employ a 'snapshot' test for seaman status, inspecting only the situation as it exists at the instant of injury. . . ." *Id*. at 363 (quoting *Easley v. Southern Shipbuilding Corp.* 965 F.2d 1, 5 (5th Cir. 1992) (quotation marks omitted). But the Supreme Court also warned that lower courts must be mindful that when a maritime employee's assignment changes, his seaman status may change as well. *Id*. at 372. Therefore, "if a maritime employee receives a new work assignment in which his essential duties are changed, he is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities in his new position." *Id*.; *see also Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 556 (1997) ("the employee's prior work history with a particular employer may not affect the seaman inquiry if the employee was injured on a new assignment with the same employer.").

The Supreme Court instructs us in *Papai* that "the seaman inquiry is a mixed question of law and fact, and *it often will be inappropriate to take the question from the jury*." *Papai*, 520 US. at 554 (emphasis added); *Chandris,* 515 U.S. at 369. Where, however, the undisputed facts reveal that

a maritime worker does not have an adequate temporal connection to vessels in navigation, the court may grant summary judgment. *Id.* at 371.       When we start from the position, as the Supreme Court instructs us to, that it is *often inappropriate* to take this particular question away from the jury, and we combine that with (1) our mandate concerning summary judgment (we must take all facts in the light most favorable to the nonmoving party) and (2) the district court's repeated warning that the "factual issues in this case were close and difficult," there should be little disagreement with our decision to reverse the district court and remand this case for trial. Neither this Court nor the district court below should take this question of fact out of the hands of a jury.

To determine if an individual worker is a seaman, *Chandris'* first prong requires that "an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission." *Id.* The Supreme Court in *Chandris* admitted that satisfying the first prong of the test is relatively easy: the claimant need only show that he "does the ship's work." *Id.* This threshold requirement is "very broad," encompassing "all who work at sea in the service of a ship." *Id.*

Here, it is clear that Arnold satisfies this threshold requirement. Although the district court did not explicitly address this prong in the context of Arnold's work throughout the entire Black Rock Lock project, the undisputed evidence shows that Arnold contributed to the functioning of many vessels over the nine month project.[3] He was the tugboat captain transporting the derrick boat from Michigan to New York, conducted the daily maintenance of all three vessels, navigated all the vessels throughout the project, and was working on a vessel when injured. Arnold, therefore, easily clears this initial Jones Act hurdle.

---

[3]The district court's analysis is focused exclusively on the wedge plate phase.

Under *Chandris'* second prong, "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both duration and nature." *Id. Chandris* further explains that "a worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act." The district court did recognize that the thirty percent rule is a guideline that can be departed from under appropriate circumstances. Under this guideline, the district court erred when it divided the Black Rock Lock Project into distinct phases and took a snapshot of the work for which Arnold was responsible. The Supreme Court cautions that when "evaluating the employment-related connection of a maritime worker to a vessel in navigation, courts should not employ a 'snapshot' test for seaman status, inspecting only the situation as it exists at the instant of injury ." *Id.* at 363. At the exact time Arnold was hurt, the project was in a four to five week "phase" of wedge plate attachment. During this period, Arnold spent only 10% of his time moving the vessels and the rest of his time *using* the raft to aid in welding the seawall. However, the entire project from beginning to end was over eleven months, nearly thirty-six weeks. This phase, or snapshot as it were, was less than 10% of Arnold's entire work assignment, *e.g.* the completion of the Black Rock Lock Project.

The question that the district court does not address is whether Arnold worked 30% of the entire project "in the service of a vessel." As recounted above, Arnold worked almost exclusively abroad the derrick boat from February through the end of July (~twenty weeks or 55% of the total project time). When he began the wedge phase of the project, he was still responsible for navigation of the boats (about 10% of the day), inspecting the vessels every morning, and making repairs. Additionally, the majority of the welding was done while Arnold was on a raft. When we look at

the facts in the light most favorable to Arnold, he spent well over 30% of his entire time on the project working in direct connection to a vessel.[4]

The district court and Luedtke would like this Court to interpret Arnold's work on each phase of the Black Rock Lock project as a separate assignment. This would force us to employ the snapshot test in determining his seaman status. Viewing the evidence in the light most favorable to Arnold, he was hired to be the foreman in the reconstruction of the seawall at Black Rock Lock. He was not a temporary employee. Arnold had a 23 year history as a seaman with Luedtke and was most integral to the completion of the project. Although others were laid off or released as the project evolved, he was the foreman and his presence was necessary from beginning to end. Arnold was the only Tugboat captain, he was responsible for moving the derrick boat, his own work raft, as well as the tugboat. Arnold even participated in the welding of metal plates, a task he had not previously attempted. As the foreman, Arnold was the project's utility man. In addition to his traditional seafaring duties and responsibilities on this project, he had to work all the odd jobs to make sure the seawall was successfully repaired. These are all genuine issues of material fact that

---

[4] Even Arnold's connection with the raft, during the wedge phase, is substantial in nature. The Supreme Court, in a recent unanimous decision, *Stewart v. Dutra Constr. Co.*, defined § 3 broadly stating that a vessel includes "every description of watercraft or other artificial contrivance used or capable of being used, as a means of transportation on water." *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 489 (2005). Accordingly, the raft Arnold was using to complete the wedge phase was a vessel. In the welding phase of the project, Arnold carried the wedge plates from the beach back to the seawall. He attached the wedges from the raft. The raft was consistently moved with Arnold abroad down the length of the wall as wedge plates were attached in place. It is does not matter in this instance whether the raft was moved by a crane or by Arnold's navigation. It was clearly capable of being of being used as a means of transportation on water. The question of how substantial in nature and duration Arnold's connection to the raft was, however, should be left for the jury to decide.

suggest that Arnold was assigned to complete the eleven month Black Rock Lock Project and would have done so but for suffering an injury. The district court concedes that before the wedge phase began, Arnold was probably a seamen for Jones Act purposes. Although this question is appropriately left to be determined by the jury, it may suggest that the totality of Arnold's employment on the seawall repair project, he was indeed a seaman. In *Stewart*, the Supreme Court reaffirmed its position that "a worker does not 'oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured.'" *Stewart* 543 U.S. 481, 495 (quoting *Chandris*, 515 U.S., at 363) (citation omitted). In this light, summary judgment was inappropriate. There are genuine issues of material fact relating to Arnold's connection to the vessels both in duration and nature as it relates to his work on the Black Rock Lock Project. These are questions of fact that will determine whether Arnold was a seaman for Jones Act purposes. We leave these questions for the trier of fact.

### III. Conclusion

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment in favor of the Luedtke on Arnold's Jones Act claim and **REMAND** with instructions to send the case to trial.

Richard Mills, District Judge dissenting:

To be protected under the Jones Act, the second prong of Chandris, Inc. v. Latsis, 515 U.S. 347, 368, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995), requires "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." Id. (citation omitted). The record shows that Arnold used a work-raft to transport himself and his tools along the canal's waterway during the seawall's construction. Thus, the work-raft was a vessel. See Stewart v. Dutra Construction Co., 543 U.S. 481, 497, 125 S.Ct. 1118, 1129, 160 L.Ed.2d 932 (2005) ("[A] 'vessel' is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment.").

Unfortunately for Arnold, he never argued that the work-raft was a vessel until he raised the issue in a motion for reconsideration. Raising an issue for the first time in a motion for reconsideration does not preserve the issue for appeal. See Thurman v. Yellow Freight Systems, Inc., 97 F.3d 833, 835 (6th Cir.1996) (raising an "issue for the first time in [a] motion to alter or amend the judgment . . . [does not] preserve the issue for appeal.").

In my view, Arnold cannot satisfy the second prong of the Chandris test without establishing that the work-raft was a vessel. Because Arnold waived this issue, his Jones Act claim should fail. Accordingly, I respectfully dissent.